**UNITED STATES of America, Appellee,**

v.

**Maurice SCHURR, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Harry ROSETSKY, Appellant.**

**Nos. 84–1404, 84–1405.**

United States Court of Appeals,
Third Circuit.

Oct. 30, 1985.

Edward S.G. Dennis, Jr., U.S. Atty., Walter S. Batty, Jr., Chief of Appeals, Robert E. Welsh, Jr. (argued), Asst. U.S. Atty., Philadelphia, Pa., for appellee.

Thomas A. Bergstrom (argued), Philadelphia, Pa., for appellant Schurr.

Pamela W. Higgins (argued), Higgins & Madden, Philadelphia, Pa., for appellant Rosetsky.

Before GARTH, BECKER, and ROSENN, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

These consolidated appeals present challenges by two officials of Teamsters Local 929, Maurice Schurr and Harry Rosetsky, to convictions for substantive violations of 29 U.S.C. § 186 and for conspiracy to violate that statute. Appellants make two principal contentions. The first is that there was a material variance between the conspiracy identified in count one of the

indictment and the proof offered at trial, in that, whereas the indictment charged a unitary conspiracy against all of the defendants, the government's proof was of at least three separate conspiracies, all involving different members. Appellants contend that this in itself is reversible error. Appellants' second argument, also cast in terms of variance between indictment and proof, is that the jury was improperly influenced by prejudicial evidence that was admitted only on account of an overbroad indictment. Appellant Schurr argues separately that a variance between the indictment and the proof of the date of the offense requires reversal of his conviction on count two, one of the substantive counts. We conclude, however, in agreement with the government, that, although its proof was narrower than its allegations, the government proved a single conspiracy [1] and that the appellants were not prejudiced either by the variance between pleading and proof, or the alleged variance on count two. Accordingly we affirm.

## I. *PROCEDURAL HISTORY*

### A.

On February 7, 1984, a grand jury in the Eastern District of Pennsylvania indicted five officials of Teamsters Local 929, including appellants Maurice Schurr and Harry Rosetsky, for conspiracy to receive secret cash payments from "employers whose employees were represented, or eligible for representation by, Teamsters Local 929," primarily the Valley Fish Co., in violation of 29 U.S.C. § 186.[2] *See* 18 U.S.C. § 371. The twenty-six count indictment alleged that the payments were "in exchange for peace and not organizing all the employees of that Company" and that approximately $89,000 in secret payments were made to the conspirators over several years. The indictment also alleged that each of the conspirators had received additional payments from other employers in violation of 29 U.S.C. §§ 186(a)(2), 186(b)(1), and 186(d). At all times relevant to the indictment, Schurr was the President and Rosetsky was a business agent of Teamsters Local 929. The other three indicted co-conspirators also occupied positions at Local 929: Paul Cardullo was a business agent, Vice President and Secretary-Treasurer; Augustine Venditti was a business agent and Vice President; and Joseph Grisafi was a Vice President and Secretary-Treasurer.

1. On account of the jury's verdict, we view the evidence in the light most favorable to the government. *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Leon,* 739 F.2d 885, 891 (3d Cir.1984).

2. In relevant part, 29 U.S.C. § 186 reads as follows:
   **§ 186. Restrictions on financial transactions**
   **(a) Payment or lending, etc., of money by employer or agent to employees, representatives, or labor organizations**
   It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—
   (1) to any representative of any of his employees who are employed in an industry affecting commerce; or
   (2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; or
   (3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or
   (4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.
   **(b) Request, demand, etc., for money or other thing of value**
   (1) it shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.

One day prior to trial, Grisafi and Venditti pleaded guilty to two violations of 29 U.S.C. § 186(a)(2) and § 186(b)(1).[3] The government characterized these counts as relating to payments of "what are, in fact, Christmas or vacation gratuities." The government explained further that "there is absolutely no allegation or evidence of bribery as to [defendant Venditti]. Our witness will say there was no bribery and there is no evidence he accepted these [payments] as bribes." In exchange for Grisafi's and Venditti's pleas of guilty to the four substantive counts, the government agreed to dismiss as to them the count alleging the five-person conspiracy.

After these guilty pleas were entered, the government moved to dismiss the conspiracy count against Cardullo and to sever the remaining substantive counts against him. In moving for dismissal and severance, the government stated that it would have a "very serious problem proving by a preponderance of the evidence that he was a member of the conspiracy as to Valley Fish." The government also indicated that Cardullo received only gratuity payments or, as they came to be known during Schurr and Rosetsky's trial and appeal, Christmas payments. At his separate trial, Cardullo was acquitted of the substantive charges against him.

On May 22, 1984, the government's case against appellants proceeded to trial without the other alleged co-conspirators, hence on a narrower conspiracy than had been pleaded. Three days later, a jury convicted both Schurr and Rosetsky of conspiracy. Schurr was also convicted of one substantive count, and Rosetsky of six substantive counts. Schurr was sentenced to imprisonment for six months on the conspiracy count, to be followed by two years probation on the substantive count, conditioned

on payment of a fine of $10,000. Rosetsky was sentenced to six months on the conspiracy count followed by six months' probation, see 18 U.S.C. § 3651, and also to three years' probation on the substantive counts. Additionally, he was fined $1,000 on the substantive counts. We turn to a summary of the evidence.

## II. THE FACTS: SUFFICIENCY OF EVIDENCE OF A CONSPIRACY BETWEEN SCHURR AND ROSETSKY

From 1972 until October 19, 1979, at least two of the fourteen or fifteen employees working at the Valley Fish Co. were members of Local 929.[4] Beginning in 1972, Stanley Pinkus, the owner of Valley Fish, accepted the advice of Leonard Katz, an employee of the company, to make weekly payments to Local 929 to discourage union organizing and otherwise to encourage labor peace. Katz made the initial arrangements. He contacted Paul Freedman, a friend of Schurr, who, in turn, met with Rosetsky. Thereafter, Rosetsky began appearing regularly at Valley Fish and accepting weekly payments of $125 from Katz.[5] Freedman testified that Rosetsky was to share these proceeds with Schurr and Cardullo. These payments continued for approximately four years, until 1976 when Pinkus sold the business.

Several months later, Pinkus repurchased the Valley Fish business and Katz, with Pinkus's knowledge, increased to $400 the weekly amount of money deducted for payments to ensure labor peace. Katz testified that he continued paying Rosetsky $125 each week until October of 1979. Katz also testified that he began paying $200 each week to Freedman to be given to Schurr,[6] stating that these latter payments were made from 1976 until October 1979.

---

**3.** Grisafi admitted guilt to counts twenty-four and twenty-six, and Venditti admitted guilt to counts eighteen and nineteen.

**4.** Valley Fish Company stopped employing truckers and delivery people in October 1979.

**5.** Pinkus actually deducted $200 each week from the company's earnings. Pinkus testified

that he accumulated the additional $75 collected weekly so that he would have money for holiday payments.

**6.** Katz stated further that he made these payments directly to Schurr when Freedman was ill.

Freedman testified that he struck a new deal between Valley Fish and Schurr beginning in 1976, that Rosetsky and Cardullo were not aware of this deal, and that payments to him and Schurr were to be $250 each month split evenly between the two men. Freedman also testified that each year from 1976 to 1978 he received an additional $2,500 from Katz at Christmastime and that he kept $1,250 and gave $1,250 to Schurr.[7]

The government also introduced evidence of payments to Rosetsky at Christmas or vacation time from businessmen who employed Local 929 members but were not associated with Valley Fish. The evidence was introduced to prove the substantive violations of 29 U.S.C. §§ 186(a)(1) & 186(b)(1) and was sufficient to support Rosetsky's convictions on the six substantive counts. It was also introduced to prove alleged overt acts of the underlying conspiracy.

■ We believe that this evidence is sufficient to support a finding that there was a conspiracy entered into by Schurr and Rosetsky to accept payments from the Valley Fish Co. in exchange for labor peace, and that the conspiracy extended from 1972 through 1979. Even disregarding Freedman's special payments to Schurr and the non-Valley Fish payments to Rosetsky, the jury could believe Katz's testimony that payments to Rosetsky continued and conclude that such payments were in furtherance of the conspiracy originally undertaken in 1972. In addition, Pinkus testified that payments to Local 929 officials continued through 1979 because Valley Fish owed substantial amounts to the union—in his words, "quite a number of hundreds of thousands of dollars"—on account of Valley Fish's failure to make the necessary deductions for health and welfare payments and union dues. Given this substantial debt to the union, the jury could justifiably have concluded that problems with Local 929 would have resulted were it not for a continuing agreement among interest-ed local union officials that, in exchange for payments, Valley Fish's practices would not be questioned.

## III.  *VARIANCE ON COUNT ONE*

Appellants contend that there was a material variance between indictment and proof on the conspiracy count (count one). They argue that the government, assuming that it proved some conspiracy or conspiracies, was unable to prove the broad five-person conspiracy for which the grand jury had indicted Schurr and Rosetsky.

### A.  *Basic Principles*

■ It is now well settled that a conviction must be vacated and the indictment dismissed when (1) there was at trial a variance between the indictment and the proof and (2) the variance prejudices a substantial right of the defendant. *See, e.g., United States v. Maker,* 751 F.2d 614, 624 (3d Cir.1984); *United States v. Camiel,* 689 F.2d 31, 35 (3d Cir.1982). *See also Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935) ("The true inquiry . . . is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused.").

The rule proscribing any material variance between indictment and proof is grounded in three critical principles. Most fundamentally, the rule protects the right of each defendant "not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others." *Kotteakos v. United States,* 328 U.S. 750, 775, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946). Thus, a variance may be material because "the jury might have been unable to separate offenders and offenses and easily could have transferred the guilt from one alleged [co-conspirator] to another." *Camiel,* 689 F.2d at 38. Second, the rule protects the defendant's right to an "indictment sufficiently inform[ing] [him] of the charges against him so that he may pre-

---

7.  The government also introduced evidence of three larger payments from Valley Fish to Schurr. These are considered in detail in part III.C.1., below.

pare his defense and not be misled or surprised at trial." *United States v. Schoenhut*, 576 F.2d 1010, 1021–22 (3d Cir.1978). This right, of course, flows from the fifth amendment's "substantial" right "to have the grand jury make the charge on its own judgment." *Stirone v. United States*, 361 U.S. 212, 218, 80 S.Ct. 270, 274, 4 L.Ed.2d 252 (1960). Finally, the rule against variance rests on a principle akin to double jeopardy, for the rule helps to minimize "the danger that the defendant may be prosecuted a second time for the same offense." *Schoenhut*, 576 F.2d at 1021–22. With these values informing our analysis, we turn to the appellants' theories of material variance.

## B. *Failure of Proof of a Broad Conspiracy (Narrowing of the Indictment)*

Appellants first submit that the government never proved the broad conspiracy that the grand jury concluded had been undertaken by the five indicted individuals. They argue that the government, by agreeing to dismiss the conspiracy count against two defendants in exchange for their pleas of guilty to substantive violations and to dismiss unconditionally the conspiracy count against a third defendant, impermissibly narrowed the scope of the indictment.

We must consider whether the proof of this substantially narrower conspiracy resulted in a prejudicial variance.[8]

After comparing the conspiracy proved at trial with the allegations of count I of the indictment, we conclude that there was a variance. Although the indictment named Cardullo, Grisafi and Venditti, in addition to Schurr and Rosetsky, the proof at trial made only slight reference to Cardullo's possible involvement in a conspiracy and made no reference to any involvement of Grisafi or Venditti. The conclusion is

therefore inescapable that the government proved something less than the broad conspiracy alleged in the indictment.

For appellants to be entitled to relief, however, this variance must be material in light of the principles we have already identified. *See supra* III.A. In determining whether the breach is material, we are aided by *United States v. Davis*, 679 F.2d 845, 850–52 (11th Cir.1982), in which the court faced a similar situation. The indictment in *Davis* charged six individuals with a single conspiracy to distribute cocaine. After a pretrial hearing to consider the admissibility of co-conspirator statements, the court granted a government motion to dismiss the indictment against two of the alleged conspirators. The four remaining defendants were then tried under the original indictment. *Id.* at 850–51.

On appeal, the convicted defendants argued that the proof adduced at trial fatally varied from the indictment because the government had proved a narrower conspiracy than had been alleged in the indictment. Although the court of appeals agreed that there had been a variance, *id.* at 851, it concluded that the variance had not substantially prejudiced the defendants' rights. *Id.* at 851–52. The *Davis* court considered the two factors identified by the *Schoenhut* court, *see supra* 554, and decided that, even though the indictment was overinclusive, it had given sufficient notice to appellants of the charges against them, and it posed no danger of further prosecution for the same offense. *Id.* at 852. Notably, it reasoned that "appellants' contention that they suffered prejudice because they were prepared to defend against a larger conspiracy but not the smaller one is nothing more than an argument that they had less of a defense against the smaller conspiracy since the larger one may not have existed. Appel-

---

8. We have concluded in part II that the government's evidence was sufficient to prove that Schurr and Rosetsky conspired to accept payments from Valley Fish in exchange for labor peace. In so concluding, we have rejected appellants' contentions that the evidence can be read only to establish multiple separate conspir-

acies. A conspiracy with a single objective may be implemented by multiple means and remain a single conspiracy. *Cf. Braverman v. United States*, 317 U.S. 49, 53–54, 63 S.Ct. 99, 102–02, 87 L.Ed. 23 (1942) (one conspiracy does not become several conspiracies because it encompasses the violation of several criminal laws).

lants cannot say that the evidence presented against them came as a surprise." 679 F.2d at 852.[9]

We believe that the rationale of *Davis*, and of *United States v. Bowers*, 739 F.2d 1050 (6th Cir.1984) (per curiam), *see supra* note 9, is correct and applicable here. *See also United States v. Milestone*, 626 F.2d 264, 267–69 (3d Cir.1980).[10] Moreover, our conclusion is supported by analysis in our recent cases of the three factors that should be considered in determining whether the conspiracy proved at trial has varied from the conspiracy alleged in the indictment. These factors are (1) the overlap of participants; (2) a similarity in method of operations; and (3) a similarity in purpose. *Maker v. United States*, 751 F.2d at 624–26; *see also United States v. DiPasquale*, 740 F.2d 1282, 1290 (3d Cir.1984); *Camiel*, 689 F.2d at 36.

■ First, any variance between the broad conspiracy outlined in the indictment and the narrow conspiracy proved at trial did not result in Schurr's and Rosetsky's being convicted based on the conduct of other individuals. Second, both defendants also had fair notice, given the content of the indictment, that their relationship with Valley Fish would be a primary focus of the evidence at trial. They therefore were not surprised by the proof offered at trial. Finally, the overbroad indictment in no way threatens the defendants with future prosecutions for the same offense. Thus, defendants have demonstrated neither prejudice nor a material variance under their first theory of the case.[11]

### C. *Spillover of Evidence Unrelated to the Conspiracy Proved*

Appellants' second theory of variance alleges overbreadth of a different sort. The argument proceeds from the premise that, while the indictment alleged conspiracy to violate several subsections of 29 U.S.C. § 186, the government proved conspiracy to violate only one subsection, (a)(4); that is, at best the government proved that the defendants were guilty of conspiracy to accept payments from the employers at Valley Fish "with the intent to be influ-

---

**9.** The Sixth Circuit has recently followed *Davis*. See *United States v. Bowers*, 739 F.2d 1050 (6th Cir.1984) (per curiam). In *Bowers*, the court was faced with the following situation:

> The indictment charged a sweeping conspiracy involving seven defendants. Immediately preceding trial, four of the defendants pleaded guilty, leaving three defendants to go to trial. Rather than proving the originally charged conspiracy, the government offered proof as to a lesser conspiracy sufficient to cover the remaining defendants but omitting some evidence that would have been required to implicate some of the defendants who pleaded guilty.

*Id.* at 1053. The court concluded that any variance in proof of the conspiracy was not material on the theory that, because the indictment had alleged all of the facts that were proved at trial as well as facts that were not at issue at trial, the defendants actually had substantial protection against any future prosecution related to the conduct described in the indictment. *Id.*

**10.** In *Milestone*, count three of the indictment originally charged that a police officer had received a bribe with intent to affect both his decision and that of another agent. The government had moved before trial to strike the language relating to the other agent. The court

complied with this request, and the issue on appeal was whether the defendant had been convicted based on an indictment that the grand jury had not authorized. Following a review of the relevant case law, the court concluded that, because the effect of the court's action was to narrow, rather than expand, the issues the defendant was called upon to meet, the change in the indictment was permissible.

**11.** Our decision today is consistent with that of the recent Supreme Court decision in *United States v. Miller*, —— U.S. ——, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985). *Miller* involved an indictment overbroad because it alleged offenses against a single defendant that the government did not prove at trial. The overbreadth here stems from an indictment that names extra coconspirators rather than unproven crimes, but the broader lessons of *Miller* are applicable:

> Convictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment. A part of the indictment unnecessary to and independent from the allegations of the offense proved may normally be treated as 'a useless averment' that 'may be ignored.'" (quoting *Ford v. United States*, 273 U.S. 593, 602 [47 S.Ct. 531, 534, 71 L.Ed. 793] (1927).

—— U.S. at ——, 105 S.Ct. at 1815.

enced in regard to any of their actions, decision, or duties as representatives of employees or as such officers or employees of such labor organization." Appellants' argument then proceeds along two paths. First, appellants argue that the overbroad indictment enabled the government to introduce evidence of Christmas and vacation payments to Rosetsky from employers other than Valley Fish, although these payments could not prove any intent on the part of Valley Fish to influence Rosetsky's behavior. Second, appellants contend that the indictment's allegation of violations of several subsections of § 186 allowed the government to introduce evidence of substantial payments by Valley Fish to Schurr that were not within the scope of a conspiracy actually proven. Appellants contend that in each instance the evidence improperly admitted was extremely prejudicial and that their convictions must therefore be overturned. This is a classic spillover theory: appellants argue that the excessive breadth of the indictment allowed precisely the spillover of evidence sought to be avoided in *Kotteakos*.

In analyzing this spillover theory, we will proceed in three steps. First, we will summarize the evidence in question. Second, we will apply the three *Maker* factors— overlap of participants, identity of purpose, and identity of method, 751 F.2d at 625–26 —to determine whether there was indeed a variance between indictment and evidence. Finally, we will consider whether any variance we may have concluded existed was material.

1. *The allegedly improper evidence.* The evidence demonstrates that Rosetsky received payments from three employers— Finer, Wasserman and Silverman—unrelated to Valley Fish, each of whom appeared at trial. Finer testified that he made four Christmas payments to Rosetsky as well as to Cardullo, because he had received, independently from the two men, information about his competition. Finer testified that his payments to Rosetsky and Cardullo were unrelated to each other, and that he had had no contact with Schurr. Payments from Finer were less regular than the Valley Fish payments. The union's relationship with Finer appears to have been based more on occasionally communicating information of mutual interest than on a program to limit union membership and to avoid the payment of union dues, which, as we explained, characterized the Valley Fish connection.

Wasserman's payments to Rosetsky and Cardullo were made for a five-year period, and each was aware that payments were being made to the other. The Wasserman payment thus provides some support for the broad allegations of conspiracy. However, the Wasserman payments were sporadic, more like the Finer payments than the Valley Fish ones. Moreover, there was no evidence that Wasserman's payments were directly related to any special treatment by the union. There is, therefore, little basis for an inference that other union leaders would expect to share in the payments.

The holiday payments from Silverman are still more difficult to relate to the conspiracy proved at trial. These payments were made at Christmas time in 1978 and 1979. There was no evidence that Silverman made these payments because the union had treated him favorably.

The allegedly improperly admitted evidence about payments to Schurr established that he received three large payments from Valley Fish apart from the regular weekly payments or the Christmas-time payments of $1,250 through Freedman. The payments were as follows: $2500 through Freedman in early 1979; $2000 to defray the costs of Schurr's obtaining a boat in 1980; and $1500 in 1981 after a veiled request by Schurr. The first of these payments was purportedly a portion of a "finders fee" earned by Schurr and Freedman in helping to arrange a previous sale of Pinkus's business.

2. *Was there a variance between indictment and proof?* The indictment charged Schurr and Rosetsky with conspiracy to collect money from "employers whose employees were represented, or eli-

gible for representation by, Teamsters Local 929" in violation of 29 U.S.C. § 186. The government proved only a single conspiracy to receive money from Valley Fish.

On account of the breadth of the indictment, the government was able to introduce evidence about the payments to Rosetsky from Finer, Wasserman and Silverman. It is inconceivable, however, that Finer's, Wasserman's and Silverman's payments to Rosetsky had any relationship to the conspiracy to insure labor peace at Valley Fish. Thus, the payments fail the identity of purpose prong of the *Maker* test.

Two of the three payments to Schurr are also clearly irrelevant to the conspiracy proven at trial for they were made in 1980 and 1981, after Valley Fish had stopped employing truck drivers. Because Valley Fish no longer employed truck drivers, its employees were no longer "represented or eligible for representation" by Local 929, and the 1980 and 1981 payments to Schurr clearly do not fall within the terms of the indictment.

We are left with the single 1979 payment and asked to consider whether it was an overt act of the only conspiracy proven. We are inclined to think that it was not, for (i) the payment was over ten times larger than the regular weekly payments to Schurr and Rosetsky, (ii) it did not go through Katz as did the regular weekly payments, and (iii) the payment had a special explanation—it was explained as a "finder's fee"—that distinguished it from the other payments. These factors lead us to believe that the $2500 payment to Schurr was not an overt act in furtherance of the conspiracy. We do not so hold, however, because it is unnecessary to do so and because, unlike the other payments discussed in this section, it is not logically impossible that the 1979 payment was an element of the conspiracy. Thus, we will

merely assume that the payment was unrelated to the conspiracy.

In short, because the breadth of the indictment exceeded the scope of the conspiracy proven at trial, there was a variance between indictment and proof, and evidence that arguably did not pertain to the conspiracy proven at trial was admitted. We must therefore address the question whether the variance was material.

3. *Was the variance material?*[12] In arguing in the affirmative, appellants rely on *United States v. Camiel,* 689 F.2d 31 (3d Cir.1982) and contend that the variance was material for the reasons set out therein. In *Camiel,* the government had tried three individuals on a forty-four count indictment alleging a single mail fraud scheme that involved placing "no-show" employees on the payroll of the state legislature. *See id.* at 34–35. The presentation of evidence at trial confused the chronology of events and made it extremely difficult for the jury to focus upon the legality of the conduct of specific defendants. *See id.* at 38. We held that a variance was material because "the volume and manner of presentation of the evidence created the likelihood of spillover: *i.e.,* that the jury might have been unable to separate offenders and offenses and easily could have transferred the guilt from one alleged co-schemer to another." *Id.*

▇ This case is a far cry from *Camiel.* The facts here are simple, and the conspiratorial pattern quite straightforward. This is not a case of sophisticated money laundering or disguised payments. Having reviewed the trial record, including the court's instructions to the jury, we conclude that the evidence of the Valley Fish conspiracy was substantial enough that Schurr and Rosetsky were not prejudiced by the introduction of the evidence of payments unrelated to the Valley Fish conspiracy. We also conclude that the jury would have had no difficulty distinguishing be-

---

**12.** Appellants raise no argument that they were surprised by the evidence introduced at trial or that they fear a second prosecution for the same offense. *See supra* at p. 554; *Schoen-* *hut,* 576 F.2d at 1021–22. We therefore do not consider those possibilities here, and instead limit ourselves to the prejudice facet of the materiality test. *Supra* at p. 554.

tween the conduct of the two defendants and that it was virtually impossible that the jury could have transferred a finding of guilt as to a substantive crime to a finding of guilt as to the conspiracy. *See also United States v. Miley,* 513 F.2d 1191, 1209 (2d Cir.1975) (Friendly, J.) (finding a variance immaterial in light of the brevity of the trial, the similarity in the defendants' crimes, and the limited range of the variance); *United States v. Cambindo Valencia,* 609 F.2d 603, 626 (2d Cir.1979), *cert. denied, sub. nom. Prado v. United States,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed. 795 (1980) (holding a variance not material as to one of several defendants because the discrete conspiracy in which that defendant was involved "was clearly enough established by the evidence to avoid the prejudicial effects resulting from this massive trial."). *Cf. Schaffer v. United States,* 362 U.S. 511, 516, 80 S.Ct. 945, 948, 4 L.Ed.2d 921 (1960). Moreover, the district court's charge to the jury distinguished between how the jury could consider evidence of substantive offenses and of the conspiracy, thereby minimizing any possibility of spill-over in this case.[13]

■ Appellants complain that the district court erred in rejecting a defense request for a more specific charge as to how the jury should consider evidence of substantive offenses, *i.e.,* a proposed instruction that it could not convict Schurr because another defendant receives gifts not pursu-

ant to the single conspiracy.[14] We agree that such an instruction would have been preferable, *cf. United States v. Lindsey,* 602 F.2d 785 (7th Cir.1979). We conclude, however, that any error in denying the request was harmless. In this short trial with straightforward allegations as discussed above and only two defendants, we conclude that the district court's charge to the jury was sufficient instruction that only specific evidence could be considered in determining whether appellants were guilty of conspiracy.

In sum, although the government's proof of the conspiracy varied from the allegations included in count one of the indictment, that variance did not prejudice any material rights of the defendants. We turn then to the remaining issue—Schurr's contention that there was a variance in the government's proof of the count two charge against him.

## IV. *VARIANCE ON COUNT TWO*

Schurr contends that he was prejudiced because Freedman, the government witnesses who testified about the illegal payment alleged in count two, could not remember exactly when the payment to Schurr had been made, and that this lapse in Freedman's memory prevented Schurr from presenting a tenable alibi defense to an indictment that alleged that the viola-

---

**13.** The relevant portion of the charge was as follows:

You may conclude that there were other agreements or understandings by some of the persons that you conclude conspired. Those events or that conduct, even if they happen to be other conspiracies or subconspiracies you consider in evidence in the case, cannot be the basis for finding either of these defendants guilty of the conspiracy charged in the indictment. Before the defendants can be found guilty of conspiracy in this indictment, all the elements I have mentioned to you must be found to have been proven beyond a reasonable doubt by the government. Even though there might be other conduct, other conspiracies in addition, the focus in this indictment is on this conspiracy in regard to these defendants. So, before these defendants

can be convicted, there must be this conspiracy alleged in this indictment that you find they or either of them violated.

**14.** The requested charge read as follows:

If you find that monies received by defendant Rosetsky at Christmas and vacation time from witnesses Finer, Silverman and Wasserman were not pursuant to a conspiracy with defendant Schurr, then you may not consider those payments to Rosetsky in determining your verdict as to defendant Schurr. Simply stated you may not consider those payments to Mr. Rosetsky at all in deciding your verdict as to defendant Schurr, unless you find they were received by Rosetsky as a result of a conspiracy between defendants Rosetsky and Schurr.

tion occurred "on or about February 9, 1979." [15]

■ Schurr asks this Court to adopt a *per se* rule that the government's failure to allege and prove a single date for an offense results in a material variance whenever the defendant intends to present an alibi defense at trial. Two other courts of appeals have specifically rejected such a position. *See United States v. Creamer*, 721 F.2d 342, 343 (11th Cir.1983); *United States v. King*, 703 F.2d 119, 123–24 (5th Cir.), *cert. denied*, 464 U.S. 837, 104 S.Ct. 127, 78 L.Ed.2d 123 (1983). We agree with these courts that the *per se* rule pressed by Schurr should be rejected and that, in a case involving an alibi defense, a variance in proof of a date is not material in the absence of some specific evidence of prejudice. *Cf. United States v. Krepper*, 159 F.2d 958, 964 (3d Cir.1946) ("where time is not an element of an offense, a variance between the date alleged and the date proved is not material and that proof of the commission of the crime on any day from the finding of the indictment, and within the statute of limitations, is sufficient"), *cert. denied*, 330 U.S. 824, 67 S.Ct. 865, 91 L.Ed. 1275 (1947).

■ Moreover, Schurr has failed to make the requisite showing of prejudice. The indictment itself gave Schurr notice that the offense was allegedly committed "[o]n or about February 9, 1979" so the charge was not limited to a specific date. *See Creamer*, 721 F.2d at 344; *King*, 703 F.2d at 124. Additionally, Schurr had ample opportunity to cross-examine Freedman, to impeach his credibility, and to argue before the jury that Freedman's testimony was

**15.** Schurr had supplied the government with a Notice of Alibi in accordance with Fed.R. Crim.P. 12.1.

**16.** This case is therefore unlike *United States v. Goldstein*, 502 F.2d 526, 528 (3d Cir.1974) (in banc), in which a variance between the date in the indictment and the date proved at trial was material because it was clear from the dates identified in the indictment that "in focusing on the critical elements of knowledge and bad faith, the grand jurors weighed state of mind on the wrong day and in the wrong circumstances."

too vague to be believable. *Id.*[16] When the record as a whole is considered, Schurr has not been materially prejudiced.

The judgments of conviction will be affirmed.

*Id.* at 529. The date on that indictment, April 15, 1966, indicated that the grand jury "was not aware of the very material fact that the defendant had applied for an extension of time to file a tax return and that as of April 15 he was not required to file his return." *Id.* In the instant case, the indictment on its face alleges a crime within the statute of limitations and there is no allegation that the specific date alleged is indicative of a failure to present all relevant, material information to the grand jury.